```
 1                                        Pages 1-46

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4
      Before The Honorable Richard Seeborg, Judge
 5                                     )
          ANTHONY WILLIAMS, TYOKA      )
 6        BRUMFELD, WENDY BURNETT,     )
          LAWRENCE OLIN, HAROLD        )
 7        NYANJOM, SHERON              )
          SMITH-JACKSON, and JANICE    )
 8        VEGA-LATKER, individually    ) No. 3:18-cv-01881-RS
          and on behalf of all others )
 9        similarly situated,         )
                                       )
10                   Plaintiffs,       )
                                       )
11             vs.                     )
                                       )
12        FACEBOOK, INC.,              )
                                       )
13                   Defendant.        )

14                    San Francisco, California
                        December 6, 2018
15
                    TRANSCRIPT OF PROCEEDINGS
16

17    APPEARANCES:

18    For Plaintiffs:

19    BURSOR & FISHER, P.A.
      1990 N. California Blvd., Suite 940
20    Walnut Creek, CA  94596
      BY:  Mr. Neal J. Deckant and Mr. L. Timothy Fisher
21
      For Defendant:
22
      LATHAM & WATKINS, LLP
23    505 Montgomery Street, Suite 2000
      San Francisco, California  94111
24    BY: Ms. Elizabeth L. Deeley, Ms. Susan E. Engel and
      Ms. Nicole C. Valco and Nikki Stitt Sokol, Facebook
25
      REPORTED BY:  MARLA F. KNOX, RPR, CRR
```

```
 1    Monday, December 6, 2018                          1:30 p.m.

 2                      P R O C E E D I N G S

 3                            .oOo.

 4         (Whereupon, the following proceedings commenced

 5    in open court:)

 6         THE CLERK:   Calling case No., C81818881

 7    Williams versus Facebook.  Counsel, please come forward

 8    and state your appearances.

 9         MR. DECKANT:  Good afternoon, your Honor.  This

10    is Neal Deckant from Bursor & Fisher.  With me today is

11    Tim Fisher of Bursor & Fisher for Plaintiffs.

12         THE COURT:  Good afternoon.

13         MS. DEELEY:  Good afternoon, your Honor,

14    Elizabeth Deeley with Latham & Watkins on behalf of

15    Facebook.  I have joining with me today Susan Engel with

16    Latham & Watkins.

17         THE COURT:  Good afternoon.

18         MS. DEELEY:  Nicole Valco from Latham & Watkins,

19    and I also have Nikki Sokol from Facebook.

20         THE COURT:  Good afternoon.  Okay.  Well, we are

21    here on the motion to dismiss the First Amended

22    Consolidated Class Action complaint.  Let me give you

23    some tentative thoughts having read through the

24    materials that you submitted for me.

25              With respect to the threshold question of the
```

1    sufficiency of the averments on the standing for showing

2    injury-in-fact, I think they are sufficient; and I'm

3    inclined to think it could proceed with respect to the

4    standing question.

5         I do think that Dismissal With Leave To Amend is

6    my inclination -- and I will go through some of the

7    reasons for that -- but that's more on the -- under the

8    12(b)6 rubric.

9         That said, I think the -- the common law claims

10   are probably the stronger of the current complaint.

11   Just to confirm with you, my understanding is that the

12   certain of these -- I think three of the claims for

13   relief are not -- the Plaintiffs are agreeing they are

14   not going to proceed?  Is that the CLRA and the UCL and

15   the trespass claim?

16        MR. DECKANT:  That's -- trespass, yes, that's

17   correct, your Honor.

18        THE COURT:  So then we have the New York

19   Deceptive Acts claim for relief and then also the CDAFA

20   claim.  On just enrichment, I always wrestle with

21   whether or not that is the proper standalone claim or

22   not.  Most of the time I think it's more in the realm of

23   a remedy, but we can talk about that a little bit later.

24        With respect to an issue that I did want to

25   bring up -- and that is judicial notice and

1     incorporation by reference.  Judicial notice is grossly

2     overused in a Motion to Dismiss context, and I think

3     that Judge Tashima's decision in August of 2018 -- the

4     published decision out of the Ninth Circuit, the Khoja

5     decision -- does a wonderful job of sort of going

6     through judicial notice, incorporation by reference,

7     when those can be invoked.

8          The bottom line here is that I think to say that

9     the article should be subject to judicial notice, which

10    then makes reference to a prompt, is way stretching

11    judicial notice; and I also have some -- I think some,

12    perhaps, lessee egregious with respect to incorporation

13    by reference because it is referred to in the complaint.

14    I don't think it is akin to a contract or something else

15    where it is really -- incorporation by reference because

16    it is a basis of a claim is appropriate.

17         So while I think the claims for relief need to

18    probably have another run to see if there is a

19    sufficient factual basis for them, I don't agree with

20    the Facebook side that somehow I can incorporate that

21    article and take the prompt referred to in the article

22    and say that that is the prompt for purposes of this

23    analysis.

24         The bottom line is I think there is -- the

25    inadequacy of the averments I think go to the specific

1    misrepresentations and omissions that are being alleged,

2    and there I think as it currently stands it doesn't get

3    quite past the post.  So those are my preliminary

4    thoughts.  I will go ahead and let the moving party go

5    at it anyway you like.

6         MS. DEELEY:  Sure.  Thank you, your Honor.  And

7    I appreciate you take notes or comments about judicial

8    reference.  I want to say before we get to any of the

9    merits of the argument to be clear -- and I think, you

10   know, our papers reflect this -- it is Facebook's

11   position that it does give certain users with Messenger

12   and Facebook Lite apps on Android devices the option to

13   upload contacts as well as call and text histories.

14        THE COURT:  Well, but isn't that your argument

15   that -- which I think is a legitimate argument -- that

16   the Plaintiffs need to identify the particular prompt

17   that they say is operative during the relevant period?

18   I'm inclined to think you are right about that.

19        What I don't think you are right about is -- and

20   we think the prompt that you can conclude was the

21   operative one is the one that is referred to in this

22   article that we want you to take judicial notice of.  I

23   won't do that.

24        MS. DEELEY:  That part -- that I understood, and

25   I take your comments; and Plaintiffs have challenged and

```
 1    sort of vaguely asserted sort of another prompt, and you
 2    are exactly right because what we think is missing from
 3    this complaint is exactly what you have identified.  If
 4    there was some representation from Facebook that was
 5    wrong -- as Plaintiffs have alleged -- about what the
 6    permission was, then we need to hear from Plaintiffs
 7    what is it that Facebook said because if you look at the
 8    entirety of their complaint and what -- you look at the
 9    articles, and I'm not asking -- I take your point; but
10    to make my point, if you look at everything you can find
11    in Plaintiffs' complaint, you cannot find anywhere what
12    the prompt is that they have alleged -- what it is that
13    they are talking about.  The only place you see any
14    prompt language at all is in that article where it says,
15    Text anyone in your phone.  Continuously upload info
16    about your contacts like phone numbers and nicknames and
17    your call and text history.  That's what we are aware
18    of.  They haven't alleged anything else.  I think that's
19    exactly right, and that is sort of the missing -- sort
20    of the core missing piece; and it goes to the crux of
21    their claim because what they have said here is they
22    have really alleged a unified theory of fraudulent
23    conduct here.  They have alleged that Facebook misled
24    Plaintiffs by representing that it was collecting only
25    contact information and using that permission to collect
```

1    call and text logs too.

2         Plaintiffs' claims all hinge on what's that

3    permission that they admit that they got actually says,

4    and that actually affects every claim in the case, your

5    Honor.  They have said now that it is an Android

6    permission prompt -- and just to step back with what

7    they say -- that's in their opposition brief, not the

8    complaint -- they describe it as when installing Android

9    apps through the Google Play Store, users will receive

10   an Android prompt asking them to grant access to various

11   categories of permissions on their phone; access to

12   location data, photographs, music, et cetera.

13        The problem is in the actual complaint what

14   Plaintiffs are alleging is that Defendant, Facebook,

15   violated -- in that case paragraph 40 of the

16   provision -- by representing that it was only collecting

17   Plaintiffs and class members contact lists and failing

18   to represent that it was collecting their call logs and

19   text data.  And that unified course of conduct that they

20   are alleging, it permeates every single one of their

21   claims.  So until we understand what it is that

22   Facebook -- that they are claiming they saw that

23   Facebook gave them, all of their claims fall.

24        THE COURT:  Okay.  I sort of cut off the

25   discussion to some extent on the standing question, but

1    I give you an opportunity to take a run at it if you

2    want to.

3         MS. DEELEY:  Sure.  Yeah, let me address that,

4    your Honor.  So, you know, it is our position -- and you

5    saw in the briefs, and let me see if I can try to

6    articulate it further -- that Plaintiffs don't have

7    standing because they don't allege an injury that is

8    concrete and particularized and is actual.  I think the

9    particularized point is very important here.

10        Let me start with what they say their injuries

11   are.  They have two theories of injury in their

12   complaint, your Honor.  They have deprivation of

13   income -- and I'm literally quoting deprivation of

14   income -- I think deprived of income -- and they have

15   invasion of privacy.

16        So let me take the first one, deprivation of

17   income.  Plaintiffs don't allege facts to support the

18   theory that they were injured by Facebook allegedly

19   generating income through its unauthorized use or sale

20   of their call and text logs.  The allegation of

21   deprivation of income is not particularized as it is

22   required to be and as the case law says it has to be

23   including the fundamental case here that Plaintiff cites

24   and say, you know, we had cases before that.  The *Spokeo*

25   decision makes clear that it has to be both

1    particularized and concrete.

2         Plaintiffs don't allege facts that Facebook

3    generated any income from their personal calls and text

4    logs.  That is what is missing here.  There are

5    generalized allegations about Facebook's collection of

6    call and text log data, and then there are generalized

7    allegations about how Facebook monetizes user data, and

8    the user data --

9         THE COURT:  Can't I make some inferences from

10   that?  They identify 61 different entities -- I seem to

11   recall -- that Facebook has an arrangement with respect

12   to monetizing the data.  And can't one infer from

13   that -- I mean, you are never going to have a case where

14   there is probably going to be a list of everybody's data

15   who has been taken and some entity says, Yes, I want --

16   I want that data.  It is going to be in more of a macro

17   basis.  You are saying that can never provide standing

18   for any of the people whose data has been monetized in

19   that fashion?

20        MS. DEELEY:  What they say in the complaint,

21   your Honor, is that on June 29th, 2018, Facebook

22   produced 747 pages of documents to Congress which show

23   that Facebook has generated in -- excuse me -- which

24   shows that Facebook has agreements in place to share its

25   user data with 61 different entities.  These entities

1    include:  Apple, UPS, Microsoft, et cetera.  Nothing

2    about that statement, number one, says anything about

3    call and text log data, anything about what kind of data

4    they are talking about; and it certainly doesn't say

5    that they have these agreements to share it with to

6    monetize that data, which is what you need for

7    deprivation of income.

8         There is nothing in that allegation that would

9    suggest or from which you could draw an inference that

10   it is the call and text log data that -- that Plaintiffs

11   have asserted here that is being shared with these

12   entities; that those entities are paying anything for it

13   or that it is being monetized by those entities in any

14   way, and that is where we get away from the requirements

15   here and why these pleadings are just -- on their face

16   just insufficient to get over the hump of actual injury

17   and particularized injury here.  In fact, when you step

18   back, user data is broad; and I don't think we can draw

19   an inference from that; that there is economic value in

20   what is call and text data.

21        Let's step back a second.  So Plaintiffs admit

22   that they provided permission for contact information.

23   What they say that they didn't provide permission for or

24   that they were misled to provide is call and text data.

25   That would be -- and they have described it -- the

1    timing of calls and texts, when the person calls and how

2    long it lasts; and it would also be whether it was

3    incoming, outgoing or missed.  The contact information,

4    they already agreed, the who they are talking to; that

5    was already permitted to be disclosed by their own

6    collected -- by their own admission here.  They say they

7    got that.  So what is the incremental, even additional

8    economic value of what they are claiming was actually

9    collected here?

10        They haven't, first of all, alleged that their

11   particular data was monetized to anybody -- whether by

12   Facebook or anyone else or that you could monetize it --

13   and they haven't alleged that Facebook monetized that

14   data, and they haven't alleged that that data has any

15   value; that they were deprived of any value or any

16   potential income from that data.

17        THE COURT:  Okay.  Let's -- let's move to the

18   prong -- you have talked about the revenue prong, the

19   monetizing prong.  Then you say you also have a standing

20   argument with respect to the privacy.

21        MS. DEELEY:  Sure.  That's -- and that's really

22   on the invasion of privacy.  That is literally what they

23   say; and invoking the phrase, invasion of privacy, isn't

24   by itself enough to get to Article III standing here;

25   and they don't have anything more.

1          I think the Ninth Circuit's decision in *Cahen*

2    recently affirming a decision by the Northern District

3    Court, Judge Orrick, similarly -- it dismissed claims on

4    similarly conclusory allegations of invasion of privacy.

5    There the Plaintiffs alleged that without their

6    knowledge Defendants collected driving histories and

7    vehicle performance data and shared it with a third

8    party.  The Ninth Circuit affirmed the decision finding

9    that Plaintiffs failed to complete specific allegations

10   about how their specific privacy was invaded, and the

11   cases that Plaintiffs cite when you go through them is

12   there are cases that say -- you know, that have certain

13   invasions of privacy that do meet the Article III

14   standing threshold; but in those cases what you say is

15   something beyond just the boiler plate invasion of

16   privacy.

17         For example, in some cases like the *Van Patten*

18   case, Congress has recognized a particular type of

19   invasion of privacy.  There in the *Van Patten* case they

20   were looking at the TCPA.  You have cases where a

21   Defendant expressly promised not to collect certain type

22   of information, for example.  So it's not just a naked

23   invasion of privacy.  It is an invasion coupled with --

24   coupled with some promise not to do something or you

25   have something that is particularly sensitive

```
 1    information that when disclosed to third parties, there
 2    is allegation that it has created some kind of risk.
 3    This comes up a lot, your Honor, in the hacking cases
 4    where social security numbers, credit card numbers --
 5    credit card numbers and the like are taken by hackers
 6    and where Plaintiffs properly alleged that there is some
 7    real actual risk of identity theft there.
 8          And so these plus factors, as I will call them,
 9    there is nothing here on these sort of bare allegations
10    that gets that; but I think this invasion of privacy
11    point, it also bleeds nicely into the merits point on
12    invasion of privacy, which I also wanted to address.  We
13    have the intrusion upon seclusion claim, and the
14    California right to privacy claim.  In many instances,
15    you know, where the Courts have looked at this, you
16    know, they have dismissed it for those reasons.  So I
17    can move onto that unless you had a question.
18          THE COURT:  Well, actually I have read your
19    arguments on those; and so I'm not sure I need much more
20    discussion on that.  What I would like you to do is just
21    summarize for me is on the New York statute, the
22    Deceptive Act Statute, you have a choice of law argument
23    there separate and apart from all the other claims of
24    relief.  Why don't you tell me just a bit more about
25    that.
```

1          MS. DEELEY:  Certainly, your Honor.  So on the

2     choice of law claim, as we described in our briefs,

3     Facebook has a statement of rights and responsibilities.

4     Plaintiffs don't challenge it.  That statement of rights

5     and responsibilities contains a California choice of law

6     clause.  Let me read it to you.  The laws of the State

7     of California will govern any claim that might arise

8     between you and us without regard to conflict of law

9     provisions.

10         That provision requires that California law be

11    applied here because if you look at the California law

12    on -- excuse me -- California law on the choice of law

13    principles, unless the chosen law -- and here the law is

14    California -- violates some fundamental policy of the

15    State whose law would otherwise apply -- in this case

16    New York -- that state has a material greater interest

17    in the determination of a particular issue, and that's

18    just Hornbook law.

19         Here what we have is a New York consumer

20    protection statute in Section 349.  I don't think I have

21    to tell you, your Honor, because I know you deal with

22    them all the time that California has very robust

23    consumer protection statutes in both the Consumer Legal

24    Remedies Act and the UCL 17-200 claim, both of which

25    Plaintiffs had brought and now have dropped.

1          So let me address the *Biometric* case, which

2     Plaintiffs raise, because I think -- I think that is

3     even instructive here.  That is -- first of all, let me

4     just say, the notion that Facebook's choice of law

5     provision is not enforced in this district is just not

6     accurate.  The choice of law provision that Facebook has

7     has been enforced in this district against other state

8     laws numerous times including in the *Palomino* case,

9     which we cited for you.

10         The *Biometric* case is an outlier.  It is an

11    outlier for this reason:  In the *Biometric* case there is

12    the -- and I will probably get the name wrong of the

13    Illinois statute that was applied there -- I know -- I

14    don't have it at my fingertips.  I think it is in our

15    brief -- it is the Illinois Biometric Privacy Act.  That

16    privacy act has no legal equivalent in California unlike

17    Section 349 of the New York General Business Law, the

18    Deceptive Act & Practices Act is a consumer protection

19    law just like those that we have in California; and

20    California provides numerous remedies under their laws.

21    You can get restitution.  You can get damages, et

22    cetera.  So there is no fundamental policy in New York

23    that would be undermined by applying the California

24    Consumer Protection Act statute there as the parties

25    have agreed to do.

 1          *Palomino* case, for example, your Honor, is a

 2     case in this district.  It is far more comparable to

 3     this one.  There, that Court dismissed Plaintiffs

 4     attempt to bring a New Jersey consumer protection claim;

 5     and it specifically recognized that California has these

 6     robust consumer protection laws, and therefore there was

 7     no -- there was no failure of fundamental public policy

 8     there, which is a pretty high bar that you would have to

 9     reach to overcome the party's choice.

10          THE COURT:  What is on that issue about unjust

11     enrichment?  I know you have other reasons why you think

12     it falls for the reasons you already articulated.  On

13     the issue of whether or not it is an appropriate

14     standalone claim, there is certainly a law that says in

15     a limited circumstance you can have an independent claim

16     styled as unjust enrichment.  But in this case -- again

17     I know you have other arguments why you don't think it

18     is a viable claim -- but could it stand just from a

19     legal perspective as a standalone claim?

20          MS. DEELEY:  No.  And here is why, your Honor --

21     and I recognize that some Courts have been split on this

22     issue -- when you have someone who has raised an unjust

23     enrichment claim as a standalone claim, the

24     circumstances where that might be allowed to go forward

25     is effectively converted into, you know, restitution or

1    a -- what I will call a quasi contract type claim.

2    Those circumstances are nothing like what we have here.

3         One of those was, for example, the *National*

4    *Union Fire Insurance* case, which -- I think Plaintiff

5    cited that -- you had a brokerage agreement among a

6    group of Defendants.  There was one Defendant that had

7    an agreement.  There were numerous other Defendants that

8    were not part of that agreement.  There was a scheme to

9    try to and, I think, what I will call, pay less than

10   what they were supposed to pay under the contracts by

11   sort of getting together between the one contracting

12   party and these other parties and colluding to pay less.

13   And in that case where you have, one, you had a contract

14   with some people -- one of the Defendants and not the

15   others -- that contract for a variety of reasons, there

16   was fraud involved in that contract.  So it was fair in

17   that case -- and by the way, economic benefit and value

18   had been provided, the exchange of the services there.

19   I can't remember off the top of my head exactly what it

20   was.  I think it involved some kind of landfill issues;

21   but in any event, what you had there was a benefit that

22   was being exchanged from one to the other and some

23   fraudulent effort to get around it.

24        It does tie a little bit, your Honor, when you

25   look at this case versus the classic case where you have

1    a quasi contract and you have restitution.  The example

2    is, you know, I talked to Mary about paving my driveway.

3    We don't really reach an agreement or anything.  She

4    paves my driveway.  Then I'm like, Oh, we didn't have an

5    agreement.  I will keep the paving, and you don't get

6    paid.  That is nothing like what we have.

7         First of all, the parties do have an agreement.

8    There is nothing in the agreement at all suggesting that

9    there would be payment for any kind of data collection,

10   and Plaintiffs haven't tried to in any way allege any

11   type of quasi contract type theory that would fit here

12   nor could they because, again, it goes back to the point

13   about the value of these calls and text logs and whether

14   that is really any sort of economic benefit that is

15   exchanged there.

16        So -- I think in this situation it just doesn't

17   fit any of those exceptions that you usually see when

18   Courts have -- while some say it is not a standalone

19   claim -- where some Courts have allowed it to proceed in

20   any event in sort of a quasi contract type construct.

21        THE COURT:  Okay.  Let me hear from Plaintiffs.

22        MS. DEELEY:  Thank you, your Honor.

23        MR. DECKANT:  Thank you, your Honor.  Since,

24   your Honor, has helped us out with a tentative ruling,

25   I'm just basically going to stick to the same point that

you raised. I would like to discuss the RJN and prompts, the standing issue, GBL Section 349 and unjust enrichment.

So I will begin with the prompts. The first issue is -- this connects to the RJN -- I think, your Honor, correctly decided to deny the request for additional notice. Now that said, I do want to clarify something for the sake of the record. On the third page of Facebook's motion to dismiss, you are going to see a screen shot with this prompt that they say basically informs users of the Facebook Lite and Facebook Messenger apps, that they are uploading their contact list. I want to be very clear to the Court, however, that that prompt is not alleged anywhere in the complaint. It is not the same prompt that is requesting the contact list as you see in paragraph 1 of the complaint.

As you see in our Motion to Dismiss Opposition -- I think it is page 6 -- pages 7 through 9 discuss that prompt that is copied and pasted from the Ars Technica article, Exhibit A. It is our position that that prompt was not in place during the class period. You will see on the pages referenced --

THE COURT: That's all fine, and I agree with you. As I said, I'm not going to grant the request for

1    judicial notice or incorporation by reference.  Where

2    does that leave you?  You need to -- from the Defense

3    perspective, you need to identify what -- for all of

4    your claims effectively -- what the operative prompt

5    was.  And so it goes -- doesn't it go back to you, and

6    your pleading is a bit amorphous on that.  I mean, it's

7    Well, you know, we don't know exactly when and what time

8    and which prompt was there and that kind of thing.  I

9    mean, isn't it going to be your responsibility if you

10   are to have a sufficient complaint to identify what you

11   think the operative prompt was?

12        MR. DECKANT:  Yes, your Honor.  Thank you for

13   hitting that point, and I would like to actually move on

14   to the prompt at issue.  This is what I refer to as the

15   Android prompt in my opposition brief that is cited on

16   the very first page of my opposition.

17        Now, one issue is that on reply Facebook

18   contends that this Android prompt -- that's how I refer

19   to it -- is somehow not a Facebook prompt.  They

20   actually say on the very first page in their reply

21   brief, they say, "Plaintiffs abandonment of their

22   allegations of a Facebook prompt requires dismissal of

23   their remaining representation-based claim under Section

24   349 of New York's General Business Law.  It also

25   requires dismissal of Plaintiffs' remaining claims,

1   which all require Plaintiffs to plead that Facebook

2   lacked permission to access their call and text logs."

3   That is on the first page of the reply brief.

4        To be very clear, we did not abandon any

5   allegations of the Facebook prompt.  Let me just

6   explain.  If the Court is more familiar with iPhones,

7   when you install apps from the Apple store, you

8   sometimes get a screen saying, Hey, do you want to grant

9   these various permissions to the apps.  Android works

10  the exact same.  When the Plaintiffs downloaded and

11  installed the Facebook Lite and Facebook Messenger apps,

12  the allegations -- that we have put in paragraph 1 of

13  the complaint -- they were given an Android prompt to

14  grant permission to their contact list on the phone.

15       THE COURT:  Isn't the specific language going to

16  be of some consequence?  In other words, what -- I

17  understand what a prompt is, just as you have described

18  it; but doesn't it, as I said, behoove you to say, And

19  the language was X of the authorization request?  Don't

20  you have to do that?

21       MR. DECKANT:  Your Honor, that is what we are

22  trying to get at when we said that the request was for

23  access to the, quote-unquote, contact list.

24       THE COURT:  Well, that is sort of -- that is a

25  description of what the subject matter of the

 1    authorization request is.  What I'm asking you is -- and

 2    you can tell me if you don't think you need it -- don't

 3    you need specific -- a lot will turn on -- if you are

 4    making claims of misrepresentation and omission, we need

 5    specific language identified under 9(b) because some of

 6    these claims are fraud claims.  So don't you have to be

 7    quite specific about, you know, the old who, what, where

 8    and when, what exactly the language was, when that

 9    language was the applicable language, you know, during

10    the relevant period?  Don't you have to do that?

11         MR. DECKANT:  Well, your Honor, number one, I

12    think we actually did include it by alleging the contact

13    list.  I know the Court disagrees.  It is my position

14    that we do include that in the contact list on

15    allegation in paragraph 1 of the complaint.

16         THE COURT:  Well, you have -- I guess let's see

17    if we can come to some agreement on at least what the

18    ground rules are, and then we can agree to disagree that

19    you have gotten to where you need to go.  It is your

20    obligation in this complaint because of the nature of

21    the claims to identify what you believe to be the

22    operative prompt particularly -- not generally,

23    particularly what that prompt was?  You do agree that

24    you need to do that?  You are telling me, We did it.  I

25    will go back and look.  They are saying, No, you didn't

1  do it; but we all agree that is what your obligation is.

2  You can't just generally say there was a prompt during

3  all of this period of time, but we don't need to tell

4  you what the language was or how -- when it was

5  operative and when it wasn't.  None of that we need to

6  aver.  You do need to aver that.

7         MR. DECKANT:  I agree with you, your Honor.

8  That's to the extent that we are attempting to allege a

9  misrepresentation; that we do need to allege the actual

10  misrepresentation at issue.  Again, I tried to do that

11  by alleging the, quote-unquote, contact list prompt.

12         THE COURT:  Okay.

13         MR. DECKANT:  Now, to be clear, your Honor, this

14  case also concerns an omission.  Each of the Plaintiffs'

15  paragraphs state that Facebook's omissions concerning

16  its practice of scraping call and text logs plays a

17  substantial part and a substantial factor in each

18  Plaintiffs' decision to install and use the Facebook

19  Messenger and Facebook Lite apps.  There is an omission

20  component to this case in the sense that Facebook did

21  not disclose what they would be collecting, but there is

22  also a misrepresentation component.  I contend that

23  stating that the permission Android prompt to access the

24  contact list is actually an affirmative

25  misrepresentation.

1          Also our complaint cites -- I think it is either

2     paragraphs 13, 19 or 20 -- we actually quote a Facebook

3     spokesperson who is describing the purpose of the data

4     collection, and it is our contention that that too is a

5     misrepresentation.

6          So the Court is correct.  We do need to allege

7     the affirmative misrepresentation to the extent that we

8     are going forward on the misrepresentation theory, which

9     I have attempted to do.  We are also trying to move

10    forward on an omission theory.  We allege that there is

11    simply an omission of behalf of the actual nature of the

12    collection practices.

13         THE COURT:  Okay.  Why don't you talk about

14    standing?

15         MR. DECKANT:  Also, your Honor, another issue I

16    would like to clarify is that the first page of

17    Facebook's Motion to Dismiss Reply characterizes this

18    case as being only based on an omission theory.  I

19    think, your Honor, has it right.  You previously

20    mentioned both an omission and a misrepresentation

21    component, and that's my theory here today.  My Motion

22    to Dismiss Opposition characterizes cases, perhaps,

23    predominantly omission cases.  I think that's correct.

24    I stand by it.  There is also a misrepresentation

25    component.  I just wanted to make that clear for the

1    record.

2         THE COURT:  Standing.

3         MR. DECKANT:  Okay.  Standing.  Now, one point I

4    made in my Motion to Dismiss Opposition brief is that

5    the cases we cite concerning standing are almost

6    universally more recent than the cases cited by

7    Facebook.  Take a look at our opposition briefing.  You

8    will see a bunch of cases cited from 2014 to 2017.  Take

9    a look at Facebook's briefing, and you will see a bunch

10   of cases from 2011, just a few 2015 cases.

11        Anyway, it is my position the Court should start

12   with *Van Patten versus Vertical Fitness Group, LLC, 847*

13   *F.3d*.  It is a Ninth Circuit case.  That is post-*Spokeo*.

14   That case concerned robocalls under the Telephone

15   Consumer Protection Act, and the Court squarely found

16   that, quote, intangible harms to a Plaintiff can satisfy

17   the injury in fact requirement.  It also found that,

18   quote, actions to remedy Defendant's invasion of

19   privacy, intrusion upon seclusion and nuisance have long

20   been heard by American courts, and the right to privacy

21   is recognized by most states.

22        It also found that "unsolicited telemarketing

23   phone calls or text messages by their nature invade the

24   privacy, disturb the policy of the recipients.  A

25   Plaintiff alleging a violation of the TCPA need not

1    allege any additional harm."

2         Now, I want to contrast that.  This is the

3    second case regarding standing the Court should look at.

4    This is *Bassett versus ABM Parking Services, 883 F.3d*

5    *776*.  That is also Ninth Circuit.  The message that I

6    want to contrast here comparing *Van Patten* to *Bassett* is

7    that you do need to allege a type of injury in

8    connection with a privacy violation.  In many context

9    the violation itself can be the injury.

10        So if you look at the *Bassett* decision, it says,

11   quote, Article III standing requires a concrete injury

12   even in the context of a statutory violation.  A

13   Plaintiff must show that a concrete injury actually

14   exists; in other words, it is real and not abstract.

15   Intangible harms and the risk of real harm can be

16   sufficiently concrete, but a bare procedural violation,

17   divorced from any concrete harm, cannot satisfy the

18   injury in fact requirement of Article III.

19        Now, the *Bassett* case is in stark contrast of

20   *Van Patten*.  In *Bassett* the allegation was a violation

21   of the Fair Credit Reporting Act where the Plaintiff

22   received a receipt with its credit card expiration

23   number printed on it, which should not have been printed

24   on that receipt.  That receipt basically ended there.

25   The Court found that that was essentially a rote

1    statutory violation with no injury attaching.  That is

2    in stark contrast to the *Van Patten* case where it was

3    found that a robocall in itself was a privacy violation,

4    and not reverse standing and not allege any additional

5    harm.  The privacy violation is injury in fact and the

6    *Van Patten* case found that that can be concrete and

7    particularized.

8         So the question for the Court is:  Is the nature

9    of our allegations closer to *Van Patten* where there is

10   an allegation of resulting injury or is it really more

11   like *Bassett* where there is just a rote statutory

12   violation and nothing else?  I submit it is more like

13   *Van Patten*.

14        The next case is *Opperman v. Path*.  That case

15   concerned the uploading of contacts on phone, I think

16   through a Yelp app, very, very similar facts to what we

17   have here.  Standing was found.

18        Similarly, *In Re: Sony Gaming Networks and*

19   *Consumer Data Security Breach Litigation*, this involved

20   the hack of Sony's PSN network by hackers in 2013 to

21   2014.  There the Court actually expressly rejected the

22   argument that, quote, none of the named Plaintiffs have

23   alleged that their personal information was actually

24   accessed by a third party.

25        Neither *Capon* and *Clapper* require such

1      allegations.  Instead Plaintiffs have alleged a credible

2      threat of impending harm based on the theft of their

3      data.  I think that is quite similar to what we have

4      here.  Also *In Re: Google, Inc. Cookie Placement*

5      *Consumer Privacy Litigation*; and we also have *In Re:*

6      *Vizio*; that concerned theft of the Plaintiffs'

7      television viewing habits.

8           So these privacy violations I think at issue in

9      this case are looking a lot more like *Van Patten*, *In Re:*

10     *Google, Vizio, In Re: Sony* and *Opperman*, are the older

11     cases cited by Defendants.

12          Now, the second portion of the privacy

13     violation -- and that is the issue of the value for

14     data -- the complaint does possibly allege that Facebook

15     is an advertiser.  It alleges that they are actually one

16     of the largest advertisers in the United States.

17          You will find at paragraph -- paragraphs 16

18     through 18 we allege that Facebook has a duopoly with

19     Google, the two largest online advertisers --

20          THE COURT:  I think the nub of their argument is

21     that it needs to be particularized and that you make

22     some general comments about Facebook monetizing

23     information, but you don't do any -- or you have not

24     included any averments that specifically talk in terms

25     of the Plaintiffs' data and how the Plaintiffs' data is

1    generating revenue that they otherwise should be

2    dissipating.

3         MR. DECKANT:  Well, I'm actually not quite sure

4    that is correct.  We allege a systematic and uniform

5    practice of Facebook and how they monetize all user

6    data.  It is just a central component of their business.

7         THE COURT:  So your contention is that

8    because -- well, so I take it from that that if data was

9    being retrieved but not all of it was being used for

10   financial gain, then that would be a problem; but

11   because all data is swept up and used, that therefore

12   you don't have -- you think you are relieved of the

13   obligation to make a particular averment.

14        MR. DECKANT:  No, your Honor.  As I mentioned

15   previously in the standing discussion, we can't have

16   Article III standing based on privacy violation pursuant

17   to *Van Patten*.  As far as the separate issue, as the

18   value of the user data goes, I actually do think we

19   correctly allege that Plaintiffs' specific user data was

20   monetized.  Paragraph 17 --

21        THE COURT:  Right, right.  My question is --

22   your first answer is, Well, we have another basis for

23   standing, so we can have this discussion; but we have

24   another basis for standing.  But the question I'm trying

25   to get at -- I will go back and look at what the answer

1    is -- I take it your position is that the Defendant's

2    contention that you need to make a particularized

3    averment, you disagree with.  You say the law doesn't --

4    for the monetizing aspect of standing, you are saying,

5    We don't need to be particular.  Is that your position?

6    I'm just trying to understand what your position is.

7         MR. DECKANT:  It is not my position.  My

8    position is that we have alleged the particularity of

9    the systematic practice of how Facebook compiles and

10   monetizes user data.

11        THE COURT:  Right.  You have -- particularly in

12   the sense of how they monetize.  What you -- I think

13   what you would concede you haven't done is any sort

14   of -- and I'm not saying you have to.  I'm going to go

15   back and look at this -- but if I'm hearing their

16   argument correctly, they are suggesting that for a

17   viable standing argument, if we are looking at the

18   monetizing concept, you have to particularly show that

19   the Plaintiffs' data was -- was utilized by the

20   Defendant to generate revenue, and that is where I'm

21   just trying to understand what people -- whether or not

22   you think you have done it or you haven't done it, I'm

23   really focused more on what you think the legal

24   obligation is for standing purposes.

25        MR. DECKANT:  That's correct, your Honor.  The

1    secondary way to establish and evaluate the user data is

2    you do have to allege a particularized monetization --

3         THE COURT:  Okay.  You agree that is the

4    standard.  You are just saying to me, Go back and look

5    and we think we have done it?

6         MR. DECKANT:  Yes.

7         THE COURT:  And then the further question is:

8    You think you have done it because, if I'm understanding

9    you correctly, the way that Facebook monetizes

10   information means you don't have to drill down beyond

11   where you have gone because they sweep up all the data

12   and they derive revenue from it.  So you can infer that

13   in that large pool of data your clients was included; is

14   that fair?

15        MR. DECKANT:  Yes, your Honor.  We allege that

16   Facebook is an advertising company; and as a matter and

17   core component of their business, they compile user data

18   and place ads on their network, yes.

19        THE COURT:  Okay.  Could you address for me this

20   specific question with respect to the New York statute

21   and choice of law?

22        MR. DECKANT:  Certainly, your Honor.  So I took

23   a look at that case, *In Re: Facebook Biometric Info*

24   *Privacy Litigation* -- that is pursuant to Illinois

25   Biometric Information & Privacy Act, that is called the

1   BIPA.  So in that case -- and this is briefed in our

2   Motion to Dismiss Opposition -- Judge James Donato held

3   that that choice of law clause was unenforceable.  He

4   specifically found that the right -- he found that the

5   BIPA was a unique statutory remedy not available to

6   California Plaintiffs.  If you were to enforce the

7   choice of law clause in Illinois, Plaintiffs sitting in

8   diversity jurisdiction would be deprived of that remedy.

9       Here the New York's General Business Law, GBL

10  349, is a substantially similar remedy in the sense that

11  it was enacted to be a, quote-unquote, broad privacy

12  statute.

13      THE COURT:  So you are just -- you know, any

14  decision -- just like a decision of mine -- vis-a-vis

15  Judge Donato, anything Judge Donato does is persuasive

16  but not binding authority on me.  Are you saying he just

17  got it wrong or it is distinguishable?

18      MR. DECKANT:  It is correct.  In the *In Re:*

19  *Facebook Biometric* case, the choice of law clause is not

20  enforceable.

21      THE COURT:  You think he got it right?

22      MR. DECKANT:  Yes.  He found that the BIPA was a

23  new statutory remedy and enforcing the choice of law

24  clause would apply for that remedy.  Here quite

25  similarly, the GBL Section 349, it has $50 statutory

1   damages per violation; and Ms. Deeley stated that it

2   mirrors California's consumer protection laws; but I

3   cannot find a California consumer protection law with

4   those $50 statutory damages as a remedy.  So I think

5   this is actually more like the Michigan BIPA which also

6   has statutory remedies.  I think in that case it was

7   $5,000 per occurrence, but we have statutories here; and

8   that is a significant difference, and I think that can

9   lead the Court into ruling the same way that Judge

10  Donato did.

11       THE COURT:  Defense counsel suggested that Judge

12  Donato's decision was an outlier in this world.  Is she

13  right about that?  I mean, are there any other decisions

14  besides Judge Donato's?

15       MR. DECKANT:  Oh, she did certainly cite to a

16  case where Facebook's choice of law clause was found

17  enforceable in this district.  There are cases going

18  both ways, but pursuant to that --

19       THE COURT:  Well, I thought she cited a circuit

20  decision.

21       MR. DECKANT:  District or circuit case, yes,

22  your Honor.

23       THE COURT:  That is a big difference for me.

24       MR. DECKANT:  Fair enough, your Honor.

25       THE COURT:  That makes a lot of difference.

1          MR. DECKANT:  That choice of law clause was

2     found to be enforceable and unenforceable depending on

3     whether the Plaintiffs would be deprived of a statutory

4     remedy.  Here they would be pursuant to GBL 349, the

5     statutory damages.

6          Last issue unjust enrichment -- I think, your

7     Honor, hit it on the head in some of your other

8     decisions -- I see -- in our Opposition brief we cited

9     to *In Re: Bruton*, *In Re: Astiana*.  It is not the case

10    that unjust enrichment just cannot be a standalone cause

11    of action.  It is well established in the Ninth Circuit.

12    Ninth Circuit held that it can be a standalone remedy.

13         THE COURT:  Well, it can be.

14         MR. DECKANT:  Yes.

15         THE COURT:  There is no doubt about it, but that

16    is only part of the answer.  It can be in certain

17    particular circumstances, but it's often thrown in there

18    when it's a case where it really isn't.  So I don't

19    think anybody disagrees.  I'm not suggesting that it

20    could never be a standalone.  I'm questioning whether or

21    not in this case it can operate as a standalone claim.

22         I sometimes wonder frankly why this battle gets

23    fought so much because almost every instance where I

24    have -- when I have determined it isn't a standalone, it

25    is covered by one of the other -- I mean, it is almost a

1    semantic problem.

2         But be that as it may, you have decided to

3    allege an unjust enrichment standalone claim; and you

4    say this is one of those narrow circumstances in which

5    it is an appropriate standalone.

6         MR. DECKANT:  Yes, your Honor.  In her argument,

7    Ms. Deeley stated that the unjust enrichment claim

8    cannot be a standalone remedy.  I think she was

9    referring to Exhibit B, the Valco declaration, the

10   Facebook statement of rights.  I think she said that

11   limited the claims and precluded us from having an

12   unjust enrichment claim.  There is nothing in there that

13   would serve as a disclaimer or a waiver for an unjust

14   enrichment claim.  It is also the case under Rule 8 that

15   claims may be pled in the alternative.  It has also been

16   held that unjust enrichment claims should not be

17   dismissed as being "duplicative or superfluous" to other

18   claims.  That is in the *Gasser versus Kiss My Face*

19   decision.  That is 2017 Westlaw 447, 3426 at pages 8

20   through 9.  It is a Northern District case.

21        THE COURT:  I can find you just as many going

22   the other way.

23        MR. DECKANT:  There are cases going both ways,

24   your Honor.  I think the right reason under Rule 8 is

25   that claims may be pled in the alternative, and I do not

1    believe that another remedy at law should be used as a

2    rationale to dismiss our unjust enrichment claim.

3            THE COURT:  Thank you.  Ms. Deeley, any brief

4    comments?

5            MS. DEELEY:  Yes, your Honor.  I think what --

6    just to the opening point about the misrepresentation

7    and omission, I just want to make one point that we

8    didn't cover clear; that it's not just enough that they

9    haven't said what the permission prompt says.  They also

10   haven't given any of the other 9(b) hallmarks that are

11   required.  When did they get the permission prompt?

12   That is important -- and I will refer to the *Ars*

13   *Technica* article -- and I'm not asking you to take

14   notice of that -- but what it does raise is a lot of

15   questions about what prompts come at what time.  Timing

16   is something that is important here.  How they got

17   the --

18           THE COURT:  It is important if it is changing.

19   It is not particularly important if it doesn't change.

20           MS. DEELEY:  Right.  Well, and that's -- their

21   permission prompts have been around, your Honor, for

22   quite some time as apps add and apps change.  So

23   permission prompts and what is allowed do change over

24   time and have depending on the version, which is also

25   important.  What is the version of the Android device

```
 1    that you are using?  That determines a lot about what

 2    permissions you get and what can be done with the data

 3    collection.  So that timing piece is very important.

 4         It is also important the who because now we have

 5    sort of a question about well, whose prompt is it?

 6         THE COURT:  Would it be important if whatever

 7    you are basing your claim on -- even if the prompts

 8    themselves are changing through time -- there are

 9    certain constants within all of the changed versions, if

10    you will.  Then you wouldn't -- it wouldn't be critical

11    that you had the exact language that is changing all the

12    time, would it?

13         MS. DEELEY:  Well, I think it matters here, your

14    Honor, because -- to be clear -- and let me step back a

15    minute.  This isn't in the pleadings, but we have raised

16    the issue of permission prompts -- Facebook provided

17    certain Messenger and Facebook Lite users at a point in

18    time an option to upload their call and text logs in

19    addition to their contacts.  The timing of that is

20    important, and it also gave those users an option to opt

21    into it and that opt in -- that opt in had language that

22    clearly disclosed call and text logs.  So the timing of

23    that becomes very important.  It is also important --

24         THE COURT:  Isn't that all information you have?

25         MS. DEELEY:  It would certainly be information
```

```
 1    that the Plaintiffs should have.  I mean, the starting
 2    point is -- if they are saying that they were somehow
 3    misrepresented by Facebook --
 4         THE COURT:  Yes.
 5         MS. DEELEY:  -- as a threshold point, they have
 6    to say how they were misrepresented and what happened.
 7    And if you look at the allegations that the individual
 8    Plaintiffs provide, they are pretty boiler plate, one to
 9    the other.  All of them downloaded it before
10    October 2017.  And based on the information in the
11    complaints, we can't even identify just from that
12    because of -- you know, a lot of users, a lot of
13    different names -- we can't identify specifically
14    whether any of them did download it; didn't.  We need
15    more information to defend -- and there is a threshold
16    that is required of these Plaintiffs in any event
17    because if you are going to come out and seek to
18    represent a class because you say you have been wronged,
19    you ought to be able to say how you were wronged and
20    give some specifics around that rather than some boiler
21    plate allegations.  I just wanted to make that point
22    clear.  It is not just the language that we are
23    challenging but the lack of all the other hallmarks --
24    the who, what, when, where, how specifics that are
25    required under 9(b).
```

1          Moving to the standing point, I just want to --

2          THE COURT:  By the way, does every one of these

3     remaining claims for relief require 9(b) pleadings

4     standard?

5          MS. DEELEY:  Yes, I think they do because as I

6     explained, all of these claims are, you know, premised

7     on this unified course of fraudulent conduct.  The crux

8     of their claim is that because of this permission that

9     they get, because of the way that it was worded,

10    Facebook was able to collect this other information.  So

11    that makes the language of that permission prompt and

12    the specifics around it fundamental to all the claims.

13         The other point, your Honor, I wanted to turn

14    for a moment on the standing issue to the cases

15    discussed by Mr. Deckant.  First of all, the *Van Patten*

16    and the *Bassett* cases, these are both -- these are both

17    *Spokeo* cases and they sort of get to the *Spokeo* point,

18    your Honor.

19         *Spokeo* was a Fair Credit Reporting Act case.

20    The question there is:  Can a violation of the statute

21    in and of itself create standing sufficient for Article

22    III?  And the answer there depends.  If it is a -- what

23    the Court called a procedural violation -- so in the

24    *Spokeo* case -- to get back to those basics, I believe it

25    was someone's profile that was provided in the internet

1    and the question was did that person actually make that

2    much money, was employed at that time, et cetera; and

3    there was some fundamental inaccuracies there.  What the

4    Court says is, Look, if there is a procedural violation,

5    they got the zip code wrong.  Not really harmed by that.

6    So that is not enough in that case.  So you have to look

7    behind the statute itself to see what the injury is that

8    happened.

9         So that's where I was talking about there are

10   these cases where the statute itself does create sort of

11   a right by its violation like in the TCPA context and

12   the robocalls where Congress has spoken to that.  We

13   don't have that in the context of calls and text logs.

14   There is no sort of statute that is speaking to that.

15        On the *Opperman, Nickelodeon, In Re: Google, In

16   Re: Vizio* case, these are ones -- and please just

17   indulge me for just a minute on these cases -- because

18   these get to the points that I was raising about what I

19   will call sort of the plus factor, if you will.  *In Re:*

20   *Nickelodeon*, the Plaintiffs allege that Viacom and

21   Google implanted cookies that track website and video

22   viewing.  The Court dismissed the New Jersey intrusion

23   upon seclusion claim against Google because the Court

24   had long understood that tracking cookies can serve a

25   legitimate commercial purpose, and the Court does not

 1    dismiss against Viacom.  And in doing so one of the key

 2    things that the Court looked at -- and this goes into

 3    the standing argument too and to some extent the merits

 4    in that case -- it goes to the point that the Viacom

 5    claim -- what was there and what created sort of the

 6    additional injury for the Plaintiffs, you know, as

 7    against both is -- the statement that we don't collect

 8    any personal information about your kids.  They put it

 9    out there that they were -- an affirmative

10    representation that they weren't doing something that

11    then they did.  So they created this expectation and

12    this injury around it, and part of the standing derived

13    from that.

14          You have the same thing in the *Google* placement

15    case, in the *Opperman* case where, again, there were

16    public promises or assurances being made that sort of

17    went beyond just the injury.

18          So that's where -- I just wanted to point that

19    out because where I was saying that there was some plus

20    factors there, that is where we see it.  I'm not going

21    to argue that it doesn't also bleed into the privacy

22    claims themselves.

23          I think on the deprivation of income point, I

24    think you understand our point on that.  And if I could

25    just for a moment on the question of the choice of law

1    and specifically -- specifically on the question about

2    the different remedies, the case that I was referring

3    to, your Honor, is the *Palomino* case; and that's

4    *Palomino v. Facebook*.  It is 2017 Westlaw 76901.  That

5    is a Northern District of California case.  I think the

6    other one I cited was actually an appellate division in

7    California for the principal --

8         THE COURT:  Who is the Northern District Judge

9    on the *Palomino* case?  If you don't know, doesn't

10   matter.

11        MS. DEELEY:  I know I have it in one of my -- in

12   any event, on that case, your Honor, what the Court

13   correctly pointed out was -- you know, Plaintiff there

14   argued that California, you know -- that New Jersey

15   policy should apply notwithstanding the California

16   choice of law, but New Jersey policy affords, again,

17   different rights and remedies; and the fact that the

18   differences in rights and remedies sort of misses the

19   point here.  The question is:  Does the State afford

20   protection?  Does the fact that you would be applying

21   California consumer protection statute, California

22   intrusion upon seclusion, California constitutional

23   privacy -- all of which in the original complaint were

24   alleged -- does that somehow undermine New York public

25   policy by not being able to apply New York's consumer

1    protection law?  That is where we say, your Honor, that

2    is not what the California courts talk about when they

3    talk about a fundamental policy difference.

4          MR. DECKANT:  If I may very briefly, your Honor.

5    I will keep it quick.

6          THE COURT:  Okay.

7          MR. DECKANT:  So Ms. Deeley touched upon the

8    9(b) considerations.  I would just like to point the

9    Court to pages 6 and 7 of our Motion to Dismiss

10   Opposition.  In the middle of page 6 I argue that we

11   have -- the Plaintiffs have alleged the nature of the

12   prompt, the standard Android prompt.  When the prompt

13   occurs -- meaning, when users install the Facebook

14   Messenger and Facebook Lite smart phone applications, we

15   say where the prompt occurs -- namely on their phones --

16   and for the purpose of the prompt, which is the stated

17   purpose is to grant access to the phone's contact list,

18   the Facebook Messenger and Facebook Lite --

19         THE COURT:  You agree that 9(b) is the operative

20   standard you have to meet, and you are saying you have

21   met?

22         MR. DECKANT:  Yes, we have alleged the what,

23   where, why, when and how.  It's on pages 6 and 7 of our

24   brief.  So I just direct the Court to please take a look

25   at those pages.

1          Now, as to standing, I think Ms. Deeley is

2     correct in a sense.  The Court needs to consider the

3     allegations in this case and decide whether it is closer

4     to *Van Patten* or *Basset*.  I know I have talked about

5     that already.  I know I discussed the *Opperman* case.  I

6     think it is right on point.  I would like to note,

7     though, that the *Opperman* case is extremely helpful

8     because among other things, it also distinguishes some

9     cases cited by Facebook.  It distinguishes one called *In*

10    *Re: iPhone Application*.  And it also involves the theft

11    of the phone contact list information, and it states,

12    quote, the Court does not believe that the surreptitious

13    theft of personal contact information -- which is what

14    the complaint alleges -- has come to be qualified as a

15    routine commercial behavior.  The Court found that it

16    did, in fact, converse standing.  This case actually

17    goes further.  It is not just contact information here.

18    It is years of call and text records.  That's paragraph

19    1 of our complaint.  It includes whether calls were

20    incoming or outgoing; whether calls were placed; whether

21    calls were missed; the duration of the call; who you

22    spoke to.

23          You know, these are the very same types of

24    considerations I think the Supreme Court was thinking

25    about where it held in 2014 *Riley versus California;*

1    that a cell phone has a sufficient reasonable

2    expectation of privacy that if the police want to search

3    it, they need to get a warrant.  There is well-informed

4    standards here, and I think the Court should consider

5    the highly sensitive nature of these -- of the

6    information collected as part of the metadata when

7    deciding this case is actually much closer to *Basset*.

8           Another point I want to make, your Honor, is as

9    for GBL Section 349 -- I know I made this request in our

10   Opposition brief -- but if the Court finds that

11   Facebook's choice of law clause is, in fact, enforceable

12   under California law, we would just respectfully leave

13   to amend for California claims.  The choice of law

14   clause shouldn't be used as both a sword and a shield.

15   If California law applies, great, then California law

16   applies; and we would like an opportunity to search some

17   of those California claims on a nationwide basis if the

18   Court does --

19          THE COURT:  If you are giving leave to amend,

20   I'm not constraining your opportunity to amend; and it

21   can include -- as far as I'm concerned -- bringing in

22   claims that at some point you didn't -- you dropped off.

23   I mean --

24          MR. DECKANT:  The very last thing I'm going to

25   say is that if the Court is at all inclined --

1          THE COURT:  It means longer process of motion

2    practice because then you will have a whole new wave of

3    motions to dismiss, but be that as it may --

4          MR. DECKANT:  Certainly.  Last thing I'm going

5    to say, if the Court is at all inclined to grant the

6    Motion to Dismiss, I would please respectfully request

7    leave to amend.  The facts continue to develop.  Just

8    yesterday some additional documents were released, and

9    these documents discussed the very same Android prompts

10   at issue from Facebook engineers.  So there is, in fact,

11   some additional facts I can put in an amended pleading

12   if the Court thinks it is warranted.

13         THE COURT:  Very well.  All right.  Thank you.

14   I will take the matter under submission.  Are you going

15   to tell me which judge it was?

16         MS. DEELEY:  Judge Gilliam, your Honor.

17         THE COURT:  Fine gentleman and a good friend.

18   All right.  Thank you very much.

19         MS. DEELEY:  Thank you, your Honor.

20         MR. DECKANT:  Thank you, your Honor.

21

22

23

24

25

1

2                    CERTIFICATE OF REPORTER

3

4       I, MARLA KNOX, Official Court Reporter for the

5    United States Court, Northern District of California, do

6    hereby certify that the foregoing is a correct

7    transcript from the record of proceedings in the

8    above-entitled matter.

9

10

11                /s/_____

12                MARLA F. KNOX, RPR, CRR
                  U.S. Court Reporter
13
     Date:  Tuesday, December 11, 2018
14

15

16

17

18

19

20

21

22

23

24

25