Pages 1 - 37

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
LAWRENCE OLIN, HAROLD NYANJOM,  )
SHERON SMITH-JACKSON, and        )
JANICE VEGA-LATKER,              )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )    NO. C 18-01881 RS
                                 )
FACEBOOK, INC.,                  )
                                 )
          Defendant.             )
_____  )
```

San Francisco, California
Thursday, May 23, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BURSOR & FISHER PA
                    1990 North California Boulevard
                    Suite 940
                    Walnut Creek, California  94596
            **BY:  NEAL J. DECKANT, ESQ.**

For Defendant:
                    LATHAM & WATKINS LLP
                    505 Montgomery Street, Suite 2000
                    San Francisco, California  94111
            **BY:  ELIZABETH DEELEY, ESQ.**
                 **NICOLE C. VALCO, ESQ.**

Also Present:       **Nikki Stitt Sokol**
                    **Assistant General Counsel**
                    **Facebook, Inc.**

**REPORTED BY:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG**
             **Official Reporter, CSR No. 7445**

| | |
|---|---|
| 1 | **Thursday - May 23, 2019**                                        **2:34 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Case C 18-1881, Williams versus |
| 5 | Facebook. |
| 6 | Counsel, please come forward and state your appearances. |
| 7 | **MS. DEELEY:**  Good morning, Your Honor.  Elizabeth |
| 8 | Deeley from Latham & Watkins on behalf of Facebook, and I'm |
| 9 | joined at counsel's table by my colleague Nicole Valco of |
| 10 | Latham & Watkins and by Nikki Sokol of Facebook. |
| 11 | **THE COURT:**  Good afternoon. |
| 12 | **MR. DECKANT:**  Good afternoon, Your Honor.  This is |
| 13 | Neal Deckant from Bursor & Fisher for plaintiffs. |
| 14 | **THE COURT:**  Good afternoon. |
| 15 | So this is a motion to dismiss by defendant.  And there |
| 16 | are various issues here in terms of what is now the Second |
| 17 | Amended Consolidated Class Action Complaint. |
| 18 | Let me ask you to start by talking about the factual |
| 19 | challenge that Facebook is making as to plaintiffs' Article III |
| 20 | standing, the injury-in-fact notion, and whether or not they've |
| 21 | shown a sufficient basis, plaintiffs have. |
| 22 | And we have this declaration of Mr. Boval.  Am I |
| 23 | pronouncing it correctly? |
| 24 | The response that I see from the plaintiffs is just that |
| 25 | regardless of that, from a legal perspective, they've averred |

 1 │ enough to establish Article III standing; and alternatively, if

 2 │ that's not enough, we need more discovery.

 3 │      So let's start with that.  And let me ask you,

 4 │ Mr. Deckant.  Deckant?  Am I pronouncing that right?

 5 │           **MR. DECKANT:**  It's Deckant, Your Honor, yes.

 6 │           **THE COURT:**  Deckant.

 7 │      What is your argument in response to this declaration from

 8 │ the software engineering official at Facebook?

 9 │           **MR. DECKANT:**  I think the Court got it correct.  Our

10 │ argument is that we're essentially being held to a summary

11 │ judgment standard here.  That declaration is dozens of pages.

12 │ It includes excerpts of source code.  It includes highly

13 │ factual-based arguments.  I believe that we're entitled to some

14 │ discovery in order to properly respond to those arguments.

15 │           **THE COURT:**  Well, you agree, though, when we're in --

16 │ first of all, let's get some ground rules agreed to.

17 │      In a 12(b)(1) context where the standing attack is a

18 │ factual attack, we can go outside the pleadings --

19 │           **MR. DECKANT:**  Correct.

20 │           **THE COURT:**  -- correct?

21 │           **MR. DECKANT:**  Yes.

22 │           **THE COURT:**  Everybody agrees with that.

23 │      And isn't it also more or less hornbook law that it is the

24 │ plaintiffs' burden to establish their Article III standing?

25 │ Right?

1      **MR. DECKANT:**  Correct, Your Honor.

2      **THE COURT:**  Okay.  So how is it that you're being held

3  to an unfair standard?  I guess I'm not following why it didn't

4  behoove you, at this point, to present whatever counterfactual

5  presentation you could present to shoulder your burden to

6  demonstrate that you have standing.

7      **MR. DECKANT:**  Certainly, Your Honor.  Well, from a

8  facial perspective, as you've seen from our papers, it's our

9  argument that we do, in fact, establish standing and we have

10 proper allegations of standing.

11     **THE COURT:**  That's the difference between a facial and

12 a factual.

13     **MR. DECKANT:**  Of course.  Now, let me get to the

14 factual portion, Your Honor.

15     In order to respond to that declaration, we wanted to

16 obtain some discovery.  We, in fact, did serve timely discovery

17 requests to Facebook.

18     In February, Facebook produced 53 pages of documents,

19 total.

20     We then --

21     **THE COURT:**  Let me stop you again.

22     What I may be missing here is, a lot of the issues that

23 are presented in this declaration from Facebook are issues that

24 are going to the devices your own clients have.  So I don't

25 understand.  It's not a case where the discovery is -- where we

**PROCEEDINGS**

1  have a circumstance that the discovery is uniquely and

2  exclusively in the hands of the defendant and therefore the

3  argument being, "Well, it's unfair to us; we should be able to

4  explore that before we're called to address this question."

5      You, presumably, can figure out issues related to the

6  devices on your side of the house.  So what discovery is it

7  that you need from them?

8      **MR. DECKANT:**  Well, the information from our own

9  device is just one datapoint.  We wanted to get additional

10  information about how the code is actually used and deployed.

11  That was the nature of our discovery requests.

12      Facebook produced a paltry production of documents, only

13  53 pages.

14      Facebook also had the contention that it was not obligated

15  to participate in discovery beyond the threshold issues.  We

16  actually filed a motion to compel about that.  The motion to

17  compel is set for hearing on June 13th.

18      We also hired some experts and disclosed those experts to

19  Facebook pursuant to the Northern District of California's

20  protective order.  Facebook made objections to our experts and

21  said that, for certain ones, we could not show them the source

22  code that was included in the Boval declaration.

23      So we've been trying to take these opportunities to

24  properly understand the Boval declaration and the various

25  factual arguments made by Facebook, and our efforts have been

1     frustrated.

2         Now, I mean, the Court could argue that our plaintiffs

3     could just take a look on their phones and try to figure it out

4     for themselves, but our plaintiffs here are just regular

5     consumers.  They're regular people.  They're not experts in IT.

6     And we would like the ability to understand the type of factual

7     arguments made prior to responding to them.

8              **THE COURT:**  Okay.  Let me go to you, Ms. Deeley.

9              **MS. DEELEY:**  Yes.

10             **THE COURT:**  Yes, Ms. Deeley.

11             **MS. DEELEY:**  Thank you, Your Honor.

12        On the factual -- factual information that we put in,

13    there are three issues that we've put factual information on

14    that we believe, if plaintiffs had a valid basis for bringing

15    these allegations to begin with, there would and should be at

16    least some evidence, that plaintiffs have to at least come up

17    with some counter to what we have put ample evidence and

18    provided all the way through source code to.

19        Let me walk through those three critical things.

20        First, as Mr. Boval had in his declaration, none of these

21    plaintiffs ever installed Facebook Lite.  This is no surprise.

22    It wasn't even available in the United States until probably

23    two weeks before.

24             **THE COURT:**  I think Messenger and Facebook present

25    very different propositions.  I think your cleanest argument is

PROCEEDINGS

1    with Facebook Lite, as I see.

2         MS. DEELEY:  Sure.

3         THE COURT:  But Messenger is a little messier, isn't

4    it?

5         MS. DEELEY:  Well, let me address that, Your Honor,

6    because, I mean -- and my point there is, just even bringing up

7    Facebook Lite, is there could be no starker example.  Again, if

8    you're going to say you downloaded something, you ought to know

9    whether you did or you didn't.  And there's no challenge to

10   that whatsoever.

11        The second point is, in the Messenger app, each of these

12   plaintiffs was presented with a consent screen seeking

13   permission to upload call and text history; and each of them,

14   according to Mr. Boval's declaration and the documents on these

15   plaintiffs that were provided in addition to that, show that

16   for each of them, where -- each of them for whom call and text

17   logs were collected for each device, that was turned on.

18        Third, in addition to the Facebook consent screen --

19        THE COURT:  Is that your two-step argument, that

20   because there's an additional, the Android operating system has

21   its own, effectively, consent part of the process and that,

22   therefore, you'd have to consent to that?

23        MS. DEELEY:  Well, there's two parts, Your Honor.

24        THE COURT:  Yes.

25        MS. DEELEY:  First --

1          **THE COURT:**  There's your consent, your whatever --

2    however we characterize it, but the clicking that you would do

3    with respect to Facebook, and then an Android process as well.

4          **MS. DEELEY:**  Correct.  There's two separate processes.

5          **THE COURT:**  Right.

6          **MS. DEELEY:**  One is an in-application consent that

7    Facebook provides, not Android, not Google.

8          Separately, when you first -- when you either are

9    installing or, in some cases, whenever an application goes to

10   request the information, there is an Android prompt that is

11   also seeking permissions.

12         Now, I will get, in a moment, to:  Do we have a facial

13   attack on -- you know, on the issue of Android?  But let me

14   address what Your Honor was talking about in terms of what we

15   put in.

16         At a minimum, on these three points, if plaintiffs had any

17   basis for bringing these allegations, they ought to be able to

18   provide some evidence on their own behalf about what they did

19   and did not download, when they did and did not download it,

20   what they saw and didn't see when they downloaded it.  And, you

21   know, those go to these three core points.  We have some other

22   points in our factual attack, but these are threshold points,

23   Your Honor.

24         And the notion that these plaintiffs would need discovery

25   in order to determine these three points, all of which are

**PROCEEDINGS**

1    alleged in their Complaint, not on information and belief,

2    Your Honor, there's a requirement under the rules that before

3    you put those allegations -- and we're a year out now.  This is

4    actually the Third Amended Complaint, a year out -- you have an

5    obligation to have some evidence to be able to make those

6    allegations --

7            THE COURT:  Well --

8            MS. DEELEY:  -- in the first place.

9            THE COURT:  -- the Boval declaration, which I have

10   read, gets quite detailed about the source code.

11       I know you don't want me to talk much about it, nor would

12   I be qualified to, in any event, but I know this is the keys to

13   the kingdom and you want it under seal and all of that.

14       But at the very least, because it is an affirmative

15   argument that is being advanced or at least affirmative facts

16   being presented by the defendants about their own source code,

17   shouldn't they have -- I know we're in, still, the pleading

18   stage and all of that, but at the very least, shouldn't they

19   have an opportunity to depose your declarants?  Because this is

20   all about your source code.

21           MS. DEELEY:  Well, this is exactly like the *Foster*

22   case, Your Honor.  We -- discovery is open.  They never asked

23   for Mr. Boval's declaration.

24       And as to -- they have --

25           THE COURT:  Deposition.

**PROCEEDINGS**

1    **MS. DEELEY:** Or, excuse me.  Thank you.  Deposition.

2    And as for the issue regarding their experts, they have

3    retained four experts.  There were two experts who worked for

4    former competitors of Facebook that we said, "No" -- and this

5    was in the protective order before it was signed -- "we cannot

6    provide our source code to people associated with" -- you know,

7    "that have just been working for our competitors."

8    There are two other experts that they have retained,

9    Your Honor, who have, I think, a combined over 30 years of

10   experience in source code.  Very -- you know, the C.V.s show

11   that they could be looking at this stuff themselves.  They have

12   not sought that discovery.

13   And as for the discovery of the source code, we provided

14   that to them.  And the source code will show you, here's what

15   the source code was before this option of allowing call and

16   text logs; here's what it is afterwards.

17   They haven't requested other source code from us.  What

18   they requested, Your Honor, was they requested documents

19   sufficient to show all notices for the collection of call and

20   text logs.  We've provided that to them.

21   So this is very much like the *Foster* case, where you

22   can't, on a 12(b)(1) motion, have a total dodge of the

23   factual -- of the factual information that defendants have

24   presented showing that you have not been injured.  There is --

25   under the Ninth Circuit, when that factual attack is filed,

1    plaintiffs must come forward with affidavits or declarations,

2    especially where, as here, at a minimum, on these core facts,

3    that ought to be something that lies in their control,

4    especially if they made these allegations to begin with.

5          And I will get to the issue about "Gee, you're raising it

6    to a summary judgment motion."  No, because here's the

7    difference.  If you go back and look at the case law -- and I

8    think a good case that sort of explains it is, the *SafeAir* case

9    kind of goes back and talks about this history and this issue

10   between 12(b)(1) and a summary judgment motion.

11         First of all, you must present some evidence to refute it

12   or do something to refute it.  Not only is there no evidence,

13   they didn't even make an argument refuting the information that

14   we put in.  So the first step is, you must come forward with

15   something.

16         Then, if there is an issue that is intertwined, an issue

17   of subject matter jurisdiction that is intertwined with a

18   substantive matter, and if there's evidence submitted that

19   creates a genuine issue of material fact, only then can

20   the Court not decide that issue; because, ordinarily, if

21   there's not an intertwined issue, the judge may decide -- even

22   if there's a genuine issue of material fact, the judge may then

23   come in and decide that genuine issue of material fact that

24   goes to the 12(b)(1) issue if it's not intertwined.

25         What the courts have been saying -- and this came up in

1   the context, Your Honor, where summary -- where subject matter

2   jurisdiction was based on a federal question, you know, a

3   statute provided jurisdiction for the Court based on a federal

4   question.

5       And so when the defendants were coming forward and saying,

6   "There's no subject matter jurisdiction here because, by the

7   way, that statute, there is no liability under that statute;

8   therefore, the Court has no jurisdiction," you can see in that

9   context where it makes sense because, in that context, a court

10  would be deciding the ultimate issues, getting rid of the

11  federal claim, essentially, and plaintiffs would have nowhere

12  else to go.

13      So if you go back and look at the case law, it makes sense

14  here.  But nothing about that case law says at all that you get

15  to just punt the issue entirely and not deal with it.

16      **MR. DECKANT:**  Your Honor, we have challenged that with

17  our facial attack.  I know we're talking about the factual

18  arguments, but we have challenged the Boval declaration with a

19  facial attack.

20      We plainly allege that there's a consent screen that says

21  "Grant Facebook Messenger access to your contacts," but it does

22  not say "Your call and text metadata."

23      We also, at paragraphs 2 and 3 of the Complaint, cited

24  internal e-mails from Facebook employees saying that it would

25  be, quote, a pretty high risk to do from a PR perspective to

**PROCEEDINGS**

1    scrape call and text logs without permission but that Facebook

2    would, nonetheless, quote, charge ahead and do it.

3        We also have additional e-mails in paragraph 3 of the

4    Complaint discussing scraping call and text logs, quote,

5    without subjecting Facebook users to an Android permission

6    dialogue at all.

7        Now, there is a dialogue that says, "Grant Facebook

8    Messenger access to your contacts," but it doesn't say "call

9    and text metadata."

10        Also, Ms. Deeley referenced an in-app disclosure screen.

11    We actually briefed that extensively in connection with the

12    first round of motion to dismiss briefing, and there's

13    significant evidence from the Ars Technica article, that this

14    case was based on, that that screen was not shown to Facebook

15    users during the class period.

16        The article says, quote, the screen -- there's actually a

17    picture of the consent screen in the Ars Technica article,

18    which was written well after the fact.  And the article says,

19    quote, the screen in the Messenger application offers to

20    conveniently track all your calls and messages, but Facebook

21    was already doing this surreptitiously on some Android devices

22    until October of 2017.

23        **THE COURT:**  I'm not sure how some article's statement

24    along those lines is one that can be accepted as -- what is the

25    basis for me to consider that?

1          MR. DECKANT:  Well --

2          THE COURT:  It's hearsay, at the very best.  What is

3     it?

4          MR. DECKANT:  Well, it's a basis --

5          THE COURT:  Go ahead.

6          MR. DECKANT:  I'm saying, Your Honor, that it's a

7     basis for -- you know, that we should have the opportunity to

8     probe behind those statements and take some discovery and to

9     figure out so we can properly respond to 12(b)(1) arguments.

10          THE COURT:  So your argument is that because, in this

11    publication, it draws some conclusion -- we don't know what

12    it's based on -- you said, "Well, that gives us at least enough

13    reason to launch some discovery"?

14          MR. DECKANT:  Well, yes, Your Honor.  I'm also

15    responding to Ms. Deeley's statements that we did not dispute

16    at all the statements in the Boval declaration.

17          THE COURT:  Well, again, I'm not sure an article

18    succeeds in disputing it, quite frankly.

19          MR. DECKANT:  Okay.

20          THE COURT:  Okay.  Well, let's talk about some of the

21    other issues, because this is not the only one that we're

22    presented with here.

23      So as we've already discussed, there's the 12(b)(1)

24    factual challenge with respect to Article III standing, and

25    then we've kind of covered, in the course of that discussion,

1   the facial challenge issue.  And then you've got some other

2   arguments with respect to your dismissal motion.

3        So why don't you go ahead and outline some of them for me.

4   We don't -- I mean, they're all briefed.  There's the

5   back-and-forth about whether or not this Third Amended

6   Complaint gets over the threshold for 9(b) purposes, which was

7   certainly one of the issues from before.  I don't need to

8   hear -- I mean, I see your arguments going both ways.  I'll

9   assess them and we'll deal with it.

10        And then you have a bunch of -- Ms. Deeley, a bunch of

11   specific defects as to each of the claims for relief.  Why

12   don't you just highlight the ones you think would benefit from

13   some further comment, if any.  I mean, your briefing covers it

14   all but --

15        **MS. DEELEY:**  Sure, Your Honor.

16        So if I could, for example, on the fraud claim --

17        **THE COURT:**  Yeah.

18        **MS. DEELEY:**  -- it blends a little with 9(b); so I

19   won't get too far into that.

20        But what I would say is --

21        **THE COURT:**  Is this their new claim, the common law

22   fraud claim?

23        **MS. DEELEY:**  Correct, Your Honor.  And so, as we had

24   before -- and I don't think anything's changed there about the

25   allegations, you know, forming a unified course of fraudulent

1    conduct.  But as to the fraud specifically, I think one of the

2    issues here that makes, you know, even responding to it tricky

3    is, is it a fraud or is it a fraudulent omission?  And there's

4    sort of a fudging of what that issue is, even in the pleading

5    itself.

6         You know, to the extent that plaintiffs are arguing that

7    this is a fraudulent omission, they certainly haven't pleaded

8    the elements of that because they've nowhere pleaded any facts

9    regarding duty.

10        And the case I would point Your Honor to -- we cited it in

11   our brief, but I think it lays it out pretty clearly, under

12   Ninth Circuit law, what would be required to assert a duty in

13   an omission case.  That's the *Hodson v. Mars* case, Your Honor.

14   It's Ninth Circuit 2018.

15        And it lays out how a plaintiff would have to assert a

16   duty here, none of which is alleged.  They must allege when the

17   defendant -- you know, failure -- excuse me.  To plead a duty

18   to disclose in a fraudulent omissions case, the plaintiff must

19   first allege that the omission was material.  The plaintiff

20   must plead that the defect was central to the product's

21   function; in this case, you know, was there something about the

22   omission of a consent screen that was critical to the workings

23   of the Messenger app.  And then, finally, they need to allege

24   one of the four *LiMandri* factors.

25        *LiMandri* is a California appellate court case, Your Honor,

1   in which they laid out four factors under duty to disclose.

2       It would be when the plaintiff's a fiduciary, what I'll

3   call the exclusive knowledge prong, which only arises under

4   this Ninth Circuit case law, again, in very unique

5   circumstances where it goes to either a safety issue or some

6   core functionality.

7       When the defendant actively concealed something from the

8   plaintiff.  Again, this goes to the *Hodson* factors.  Is it one

9   of those core features.

10      And then --

11          **THE COURT:**  Let me just ask Mr. Deckant.

12      Is this an omissions case, your fraud claim, or is it a

13  misrepresentation case?

14          **MR. DECKANT:**  I think it blends elements of both.  I

15  would probably say it's more so a misrepresentation case, but

16  there is --

17          **THE COURT:**  Of course, if it's a misrepresentation

18  case, then you do need the who, what, where, when.  And you say

19  you've done that.

20          **MR. DECKANT:**  Correct, Your Honor.  As discussed in

21  our 9(b) section, we --

22          **THE COURT:**  Okay.  All right.

23          **MS. DEELEY:**  Well, and then to that point, Your Honor,

24  I'd say, if this is an affirmative misrepresentation case,

25  what's plainly missing here is any representation by Facebook,

1    because the prompt that they are claiming that they saw is an

2    Android prompt.

3        This is -- you know, you can go back to their prior

4    briefing where they've acknowledged this.  They can't -- once

5    they sort of made that assertion to the Court, it's something

6    they're not going to back out on.

7        And I don't think that is a reasonable dispute, that

8    somehow that that was emanating from Facebook or that Facebook

9    wrote that as opposed to Android.  They certainly haven't, you

10   know, asserted how that is.

11       On the scienter element, I don't have much to say about

12   it; but basically, it doesn't even -- I don't even know if it

13   gets to *Twombly/Iqbal*.  It's like exactly what you would just

14   put in as a boilerplate assertion there.

15       As for -- let me just --

16       **THE COURT:**  Scienter can be pled different than the

17   other elements under -- again, going to the 9(b) analysis,

18   scienter is the one that you can aver generally.

19       **MS. DEELEY:**  Agreed, Your Honor.  But this one is so

20   much just cut and paste from -- you know, from the elements of

21   a fraud claim that -- and, you know, again, this is classic,

22   not even 9(b), but *Twombly/Iqbal*.

23       More importantly, let me say this one thing, because I do

24   want to address it since Mr. Deckant did.  On these e-mails,

25   these excerpted e-mails that were, you know, reported in the

 1  press --

 2              THE COURT:  The PR e-mails?

 3          MS. DEELEY:  I'm sorry?

 4              THE COURT:  The e-mails about "This is bad PR"?  Those

 5  are the ones you're talking about?

 6          MS. DEELEY:  Yeah.  The e-mails that are in the

 7  Complaint, Your Honor.  Portions of those e-mails have been

 8  excerpted into the Complaint.  These are e-mails that were, you

 9  know, provided to someone in violation of a protective order.

10      But setting all those issues aside, there's nothing about

11  these cherrypicked e-mails and, sort of, the spin that

12  plaintiffs have put on it.  Messenger's not mentioned in any of

13  those e-mails.  Neither is Facebook Lite, for that matter.

14  There's nothing in these e-mails that suggests that this is

15  what we have done.  This is an excerpted communication.

16      More importantly, if you look closely at those e-mails --

17              THE COURT:  Don't they aver, though, that that's what

18  they do pertain to?  And at this stage, for pleading purposes,

19  can't they, assuming that they, in good faith, can make that

20  averment?

21          MS. DEELEY:  I don't see how you can get that from the

22  face of these, that this is talking about the Messenger

23  application or the Facebook application --

24              THE COURT:  No, no.  I understand your point.  But

25  what I'm asking -- and I'll go back and look at the averment,

 1   but they're contending that it does pertain to that, and they

 2   have to have a good faith basis for making that averment.  But

 3   haven't they made it?  They've got these e-mail excerpts --

 4          **MS. DEELEY:**  There's no plausible inference from that,

 5   I think, from these e-mails.

 6       And what's more important, Your Honor, if you look at them

 7   carefully, they also reference a NUX screen.  And if you go

 8   back to Mr. Boval's declaration, NUX is a --

 9       What is NUX?  I'm trying to remember.

10          **MS. VALCO:**  New user experience.

11          **MS. SOKOL:**  New user experience.

12          **MS. DEELEY:**  New user.  Thank you.

13       New user experience.  That's the --

14       But that is exactly referring to the consent screen.  If

15   you look at the code in Mr. Boval's declaration, that's exactly

16   referring to the consent screen that it was saying Facebook

17   provided.  So, again, these are -- you know, to make that leap

18   from cherrypicked e-mails, I think, is a step too far.

19       Moving off of scienter, on the justifiable reliance point,

20   their justifiable reliance is:  We wouldn't have downloaded

21   these applications if we had known about this consent issue.

22       Well, they don't even establish that they chose to -- I

23   mean, they downloaded these applications, according to their

24   own -- their own allegations, before they even saw the consent

25   screen.  And none of them said, "Gosh, I got rid of these

1  applications, never used them again afterwards," or anything to

2  suggest that their use of Messenger app was somehow tied to

3  this.  And, again, it's just more boilerplate.

4       And on the damages --

5       **THE COURT:**  You're saying they would need to aver that

6  upon discovery that the information was scraped, that they then

7  said, "I'm not using this anymore"?

8       **MS. DEELEY:**  Well, they're tying it to their use of

9  the Messenger app.  They're saying, "I would never have

10  downloaded it had I known this."

11      And they downloaded it before providing any consent.  None

12  of them suggest that "Gosh, I got rid of this app now because I

13  don't want it," which they wouldn't need to because you can

14  just turn off that feature.

15      **THE COURT:**  Maybe this is a misunderstanding on my

16  part of how this worked, but isn't it that upon downloading the

17  app, that's when the information, according to plaintiffs, gets

18  scraped?

19      **MS. DEELEY:**  According to plaintiffs' --

20      **THE COURT:**  Right?

21      **MS. DEELEY:**  -- allegations, they downloaded the app,

22  and then they got an Android Messenger screen, and then that's

23  when it got scraped.

24      **THE COURT:**  I understand.  But I'm trying to

25  understand your point that somehow you find it significant that

1   there is no averment in here that says, "Well, I stopped using

2   this now because it's thwarted my purpose" or what have you.

3   And I'm not sure why they would need to do that.

4        **MS. DEELEY:**  Well, if they're saying that the whole

5   reason they downloaded this app is this, you know, deception

6   about the consent screen -- which is what they're saying --

7   they're saying, "We would never have downloaded the app" --

8        **THE COURT:**  They're saying that they were not

9   advised -- they were kept in the dark as to what was going to

10  happen upon their downloading of this app and that was

11  deceptively kept from them; and had they known, they wouldn't

12  have downloaded the app.

13       Isn't that your argument?

14       **MR. DECKANT:**  Yes, Your Honor.

15       And also, when the app is installed, it then, at that

16  moment, scrapes all of your prior texts and call metadata at

17  that moment that you first install it.

18       **THE COURT:**  Right.  So the fact that they may continue

19  to use it later on, I'm not sure why that goes one way or the

20  other to whether or not they had a claim in the first instance,

21  which is premised on this idea that they were deceived in the

22  process of downloading the app.

23       **MS. DEELEY:**  Right.  But I think if you look at the --

24  and I think this was one that we cited in our reply brief, the

25  *In Re Adobe* case, which sort of gets to this point where "Gee,

**PROCEEDINGS**

1   I" -- there's nothing to suggest that their use of this

2   application, if they weren't going to download it, it was any

3   different after they learned of this or even now.  And so

4   that's sort of my point.

5       If you were --

6           **THE COURT:**  Okay.

7           **MS. DEELEY:**  Yeah.  And on the issue of damages,

8   there's certainly no explanation of how they were damaged with

9   any --

10          **THE COURT:**  Well, they've got some -- they say they

11  can -- their experts will monetize the information to --

12  what? -- 0.05, or something or other, per person.  I mean, they

13  have a theory.  Now, whether or not the theory is going to work

14  is another question.

15          **MS. DEELEY:**  Well, again, we're still in 9(b) land

16  here, though.  And I know that you're talking about the

17  allegation that there's a market for these call and text logs

18  of five cents for a call and text log.

19      What they don't allege is, number one, that they ever

20  would have sold them.  I mean, they're only damaged if they

21  would have sold these things and somehow lost money as a

22  consequence, which, by the way, runs headlong into their

23  privacy assertion that "Gee, these things were private."

24      The notion that they would --

25          **THE COURT:**  You know better than I do.  These issues

1    are interesting, hot issues of the moment.

2        But the question is, from the plaintiffs' perspective,

3    they'll say there's value in this information, as reflected by

4    the fact that it is then incorporated into the advertising

5    revenue process of your client and that, therefore, it almost,

6    by definition, has value because that's what they're using to

7    generate -- that's what Facebook's using to generate,

8    ultimately, its revenue.

9        MS. DEELEY:  Well, they haven't said how they're

10   somehow -- how any conduct by Facebook has deprived them of

11   that.

12       If it's worth five cents and there's this market for their

13   individual call and text logs, then go sell it to Google or

14   LinkedIn or Amazon or whoever else if it actually --

15       THE COURT:  I'm trying to understand your argument

16   that to suggest that there is no value to it is belied, to some

17   extent, on sort of just a high-level analysis, it's belied by

18   the fact that there's a reason why, according to them, you did

19   this.  You want this information.  And the information is

20   useful to you in ultimately generating the revenue that you

21   generate.

22       MS. DEELEY:  Fair.  But the fact that it may or may

23   not have value doesn't mean that plaintiffs actually suffered

24   an injury or were damaged by that.

25       THE COURT:  I understand.

1    **MS. DEELEY:**  In order for them to suffer an injury or

2    be damaged by that, there has to be some availment of them that

3    they were deprived of.  And that's --

4         **THE COURT:**  I understand.

5         **MS. DEELEY:**  Okay.  So those are sort of my points

6    on --

7         **THE COURT:**  Okay.  All right.

8         **MS. DEELEY:**  -- the fraud.

9         **THE COURT:**  Well, I'll give you an opportunity to

10   respond.  And then I had a question right from the beginning of

11   the discussion that I want to get back to.

12        But go ahead, Mr. Deckant.

13        **MR. DECKANT:**  Okay.  Certainly, Your Honor.

14        For the fraud claim, Ms. Deeley argued that the prompt

15   received that grants Facebook Messenger access to your contacts

16   is an Android prompt and not a Facebook prompt.

17        That prompt does appear to be delivered through the

18   Android operating system, but the way the app is programmed,

19   the app is set up to make that prompt request.  I don't think

20   that is correct that that is purely an Android prompt and

21   Facebook had absolutely nothing to do with it.

22        When app developers create their apps, they can determine

23   what types of permissions the apps request.  And when you want

24   an app to request certain types of permission, you can set it

25   up so that the operating system makes the prompt on the app's

PROCEEDINGS

1    behalf.

2        It's like if you save a file in MS Word and you click the

3    "Save" button and a dialogue box comes up and it says, "Hey,

4    where do you want to save this document to?"  That's not just a

5    Windows or Microsoft prompt.  That was actually requested by

6    Microsoft Word through the program functionality.

7        **THE COURT:**  So it becomes theirs by virtue of their

8    triggering it?

9        **MR. DECKANT:**  Yes.  Exactly correct, Your Honor.

10       Next, as far as scienter, you're correct.  Scienter can be

11   alleged generally.  I think with the Facebook internal e-mails

12   alleged in paragraphs 3 and 4 of the Complaint, we do have a

13   good faith basis to allege scienter.  Like you said, it can be

14   alleged generally.

15       As far as justifiable reliance goes, the standard

16   allegation for reliance and the rule under California law is

17   that you would not have entered into a transaction had the true

18   facts been known.  And that's exactly what our plaintiffs have

19   alleged.  They allege that they would not have downloaded and

20   installed the Facebook Messenger apps had they known of

21   Facebook's data-scraping practices.  So we do meet every single

22   standard for fraud.

23       Now, as for damages, currently we're just talking about

24   the so-called diminution in value theory of the plaintiffs'

25   personal data.

**PROCEEDINGS**

1    I'd also like to note that we have two other prongs where

2   we can establish damages.  One prong is an inherent privacy

3   violation.  That's established in the Ninth Circuit's

4   *Van Patten* case.  If a privacy violation is sufficiently

5   severe, the very nature of the violation can, in fact, confer

6   standing and damages.

7       The third type of damages that are available to us is the

8   use of the phone's resources; namely, use of the hard drive

9   space.  CPU RAM, right.

10          **THE COURT:**  Right.

11          **MR. DECKANT:**  Now, in their briefing, they make an

12   argument that de minimis damages are unavailable, and they make

13   that argument in reference to the loss of value on the personal

14   data prong.  They don't make that argument in regards to the

15   other two prongs.

16       They said in their briefing that the standard for

17   establishing resource depletion is whether the resource

18   depletion is systematic and frequent.  That does, in fact,

19   appear to be the case here.  The apps on the phone continue to

20   monitor your call and text records and, on an ongoing basis,

21   transmit those records to Facebook.  That is the very

22   definition of systematic and frequent.

23       And as far as the purported requirement that plaintiffs

24   have to go and try to sell their data on the open marketplace,

25   we've cited ample case law in our briefing that that's not

1    actually a required allegation.  You don't need to have a

2    plaintiff try to sell their data to allege the data has value

3    and the value of the data was diminished by defendant's privacy

4    violations.

5         **THE COURT:**  Okay.  Let me just loop back all the way

6    to the beginning of our discussion, and that's when Ms. Deeley

7    and I were discussing the differences between your claims that

8    are associated with Messenger and your claims associated with

9    Facebook Lite.

10        And her point was that, at the very least, with respect to

11   Facebook Lite, there's simply a fairly stark factual problem

12   that you have, which is, according to them, your clients never

13   downloaded the app.

14        Is there really -- I mean, that's sort of a pretty clean

15   question, and that's one that you would know because you know

16   your -- or you have access to that information.

17        Having, now, the benefit of that comeback from them, are

18   you still maintaining that claim associated with Facebook Lite?

19        **MR. DECKANT:**  Yes.  We believe that our clients did,

20   in fact, download Facebook Lite.  I understand the Boval

21   declaration says they didn't.  I understand there's a factual

22   dispute here.  But we do maintain that certain of our clients

23   downloaded and installed Facebook Lite.

24        **THE COURT:**  How are you -- so how's that -- how do you

25   plan to present facts, counterfacts?  What facts are you going

**PROCEEDINGS**

1    to present, and why weren't they presented?

2           **MR. DECKANT:**  Well, during discovery, we'd want to

3    uncover additional information about any records.

4           **THE COURT:**  No, no, no.  I'm not going to let you go

5    that way.

6           **MR. DECKANT:**  Okay.

7           **THE COURT:**  Because your statement is that "We dispute

8    this because my clients say that they downloaded this."

9           **MR. DECKANT:**  That's right, Your Honor.

10         **THE COURT:**  Okay.  So at the very least, I need

11    something.  I would have -- they should declare when they did

12    it and how they did it and the like.

13       I mean, you can't just say, "Oh, we're going to do some

14    more discovery," because that just is a non sequitur when

15    you're saying it's information you have.

16         **MR. DECKANT:**  Your Honor, we just went with the

17    typical standard of a complaint, good faith basis.  We did not

18    have client declarations, but we did use information provided

19    by the clients in alleging that they downloaded and installed

20    Facebook Lite.

21         **THE COURT:**  Okay.  I'm not sure that was the right

22    decision, but okay.

23       So anything further that you need to tell me?

24         **MS. DEELEY:**  Just a few quick points on that.

25       To the extent that there is information, we have requested

1   it starting back in January -- it's not been provided to us --

2   on that Facebook Lite or any of the other Messenger apps, when

3   they downloaded it, et cetera, which we've been asking for.

4        I will -- just a quick point.  The points that I believe

5   Mr. Deckant was raising with respect to damages, I was

6   discussing damages in the context of fraud.  I think he went to

7   the standing points, which are also there.

8        I will say this:  You have our briefing on the issue of

9   what is required of allegations to state an economic injury.

10  On the privacy injury, which we didn't touch upon, I would

11  urge, just reference the Ninth Circuit decision in *Clark* and

12  the decision in *Kahan* about what is required to be stated,

13  which is not just "I had a privacy injury," but you must state

14  how it is that you have been injured by either the collection

15  or the disclosure of the information at hand.

16       And what we have here, plaintiffs have already, by their

17  admissions, said, "Hey, we gave consent to provide contacts."

18       What you're talking about here is the incremental

19  additional information about the time, the duration, et cetera,

20  of calls and text logs.  And there's not a single allegation in

21  the Complaint about how it is that that incremental additional

22  information is -- how it is that that creates a privacy injury.

23       And I think under the Ninth Circuit law that you see, and

24  then there's numerous cases under it, where you have

25  geo-location information that has been provided, you know,

1    usernames, e-mails, et cetera -- and I can run through the

2    cases.  I think they're cited in our brief, Your Honor.  I'm

3    happy to --

4           THE COURT:  Are any of these claims for relief --

5    and I'm thinking now the Computer Data Access and Fraud

6    California statute and perhaps some of the others, the

7    statutory claims.  I guess that's the only statutory claim.

8    Does that have statutory damages as an option?

9           MS. DEELEY:  In terms of the -- which case,

10   Your Honor?  In terms of the CDAFA claim?

11          THE COURT:  Does CDAFA have a statutory damage?

12          MS. DEELEY:  I don't believe so, Your Honor.  But I

13   also think for that one, you have to -- that requires an

14   economic injury.  So you cannot rely just on a privacy injury

15   for that.  The privacy injury -- and the same is true for the

16   fraud claim.  The privacy injury, the reason I addressed it,

17   because I had not brought it up before, is --

18          THE COURT:  The fraud claim -- which fraud claim are

19   you talking about?

20          MS. DEELEY:  The common law fraud claim.  It has to

21   have some --

22          THE COURT:  Yeah.  Well, that wouldn't have statutory

23   damages.

24          MS. DEELEY:  I'm sorry?

25          THE COURT:  That would not have statutory damages.

1        MS. DEELEY:  No, Your Honor.

2        THE COURT:  So what I'm asking about is -- the reason

3   I ask is that sometimes, if you've got a statutory violation

4   and you have difficulty with being able to articulate a damage

5   theory, or one, certainly, that could be considered on a

6   class-wide basis, the alternative is to look to a statutory

7   damage.

8       And you're just --

9        MS. DEELEY:  Right.

10        THE COURT:  That's why I asked about the California

11   statute.

12        MS. DEELEY:  Yeah, I don't believe so.

13        THE COURT:  You're telling me, well, it has to do with

14   only economic damage anyway; so you wouldn't have a privacy

15   violation of that statute --

16        MS. DEELEY:  Right.

17        THE COURT:  -- that would then be liquidated with a

18   statutory damage remedy --

19        MS. DEELEY:  Correct.

20        THE COURT:  -- is what you're telling me.

21       And that's fine.

22        MS. DEELEY:  Correct.

23        THE COURT:  Okay.  All right.  Anything further,

24   Mr. Deckant?

25        MR. DECKANT:  Yes, Your Honor.  In brief, we allege an

1    economic injury in the form of resource depletion of their

2    phones.

3              THE COURT:  I understand that.

4         MR. DECKANT:  As long as you have any amount of

5    damages, that confers standing.

6         MS. DEELEY:  I think we've addressed that in our

7    briefing, Your Honor, on the resource depletion and what's

8    required to actually -- what allegations are required to be set

9    for that.  We have, again, boilerplate allegations on that,

10   numerous cases that we've cited explaining that you need more

11   than that.

12        I would also -- if I can indulge Your Honor one moment on

13   the Android permission issue that Mr. Deckant raised.

14             THE COURT:  Yes.  Whether or not you trigger it and

15   it's yours.

16             MS. DEELEY:  It's not --

17             THE COURT:  The Pottery Barn, "You broke it and you

18   own it" or whatever.

19        MS. DEELEY:  Right.  And, you know, I'd refer

20   Your Honor to the -- I believe it's Exhibit B to Ms. Valco's

21   declaration, which is the Android Developer Guide.

22        We sought judicial notice of it -- Mr. Deckant didn't

23   oppose our judicial notice of that guide -- because it has

24   explanations in there about how it works.

25        It goes, Your Honor, to our facial --

1          **THE COURT:**  I'm very averse to -- you're going to now,

2   I warn you, get me on my high horse about, judicial notice is

3   so overused in motions at the pleading stage, and it is -- I

4   hear you.  I hear you telling me that they didn't oppose it.

5          But just from the description of what you want me to take

6   judicial notice of, I am very skeptical of taking judicial

7   notice of material other than "This document was filed on this

8   date," or something along those lines.

9          You're talking about asking me to take judicial notice of

10  substance of discussions about how something operates, and I'm

11  very leery of doing that.

12         But go ahead.

13         **MS. DEELEY:**  Fair enough, Your Honor.

14         But what I will say is, based on their own allegations and

15  what they've asserted, there's nothing in their allegations

16  that says that Facebook was driving the language of those

17  prompts; that Facebook was driving how Android decided to

18  present those prompts to users, either under the old versions

19  or the more recent versions that they've talked about.

20         So I just -- you know, and I haven't seen any support for

21  their theory that on those kind of thinly pled facts, that you

22  can take someone else's statement and make it a statement of

23  Facebook, where they haven't alleged any sort of theory about

24  how, you know, Facebook was -- how there was any authorization

25  to do that.

 1          THE COURT:  Putting aside this judicial notice

 2     issue --

 3          MS. DEELEY:  Yeah.

 4          THE COURT:  -- it's your contention that, first of

 5     all, they haven't -- your first line of attack, as I understand

 6     it, is they haven't done what they need to do to flesh out this

 7     suggestion that the Android prompt is somehow triggered by

 8     Facebook.  You just say they have to do more than what they've

 9     done to even make that claim.

10          And then you're also saying that factually, putting aside

11     whether or not I would take judicial notice of it, you think

12     factually it's wrong?

13          MS. DEELEY:  Correct, Your Honor.  In fact -- and this

14     is why -- and I mentioned this in our prior motion to dismiss

15     argument.  This is why the timing of when these plaintiffs

16     downloaded this feature on their phones and when they

17     downloaded it on any additional devices, why that timing is so

18     important, because under their theory, Facebook -- you know,

19     first of all, the prompts that they claim that they saw, if you

20     look at the Android Developer Guide -- and I hear Your Honor on

21     the judicial notice but -- those prompts were only provided in

22     later versions of Android which did not have the vulnerability

23     that plaintiffs assert happened.

24          And as to their allegations that Facebook then somehow did

25     a workaround, again, you could not get those prompts unless you

**PROCEEDINGS**

1  were using a later software developer kit, Software Developer

2  Kit 23 and on, to get technical.

3           **THE COURT:**  But I thought you were relying on the fact

4  that there was that set of prompts from Android.

5           **MS. DEELEY:**  Those set of prompts that plaintiffs

6  allege could only have occurred in a version of Android, an

7  operating system version, that did not allow -- did not allow

8  app developers to also collect call and text logs along with

9  the contacts.

10      So their entire theory of the case here that there is a

11  vulnerability --

12           **THE COURT:**  I understand.

13           **MS. DEELEY:**  Okay.

14           **THE COURT:**  I understand.

15      Final comments.

16           **MR. DECKANT:**  Okay.  Going back to Ms. Deeley's

17  arguments about the exact prompt and whether it was under the

18  version of Android installed by the clients in the class period

19  of time, that's going back to the factual argument.  We've

20  discussed that at length in this hearing already.

21      As far as whether the prompt that is displayed is a

22  Facebook prompt or an Android prompt, we've already discussed

23  this.  I think the Complaint is perfectly clear.  We have a

24  fraud claim based on a misrepresentation.  We allege the prompt

25  is false and misleading.  We plainly allege that it's a

PROCEEDINGS

```
1    Facebook prompt.  I think we meet the pleading standards there.
2            THE COURT:  Okay.  So I'll take the matter under
3    submission and give you an order.
4            MS. DEELEY:  Thank you, Your Honor.
5            MR. DECKANT:  Thank you, Your Honor.
6                (Proceedings adjourned at 3:20 p.m.)
7                        ---o0o---
8
9                    CERTIFICATE OF REPORTER
10           I certify that the foregoing is a correct transcript
11   from the record of proceedings in the above-entitled matter.
12
13   DATE:   Friday, May 24, 2019
14
15
16
17   _____
18   Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
             Official Reporter, U.S. District Court
19
20
21
22
23
24
25
```